# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3284

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Siyad Warsame Ali, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 16, 2010
Filed: August 5, 2010

_____

Before WOLLMAN, MURPHY, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Siyad Warsame Ali appeals his conviction on ten counts of aiding and assisting in the preparation of false individual income tax returns, in violation of 26 U.S.C. § 7206(2). Ali contends that the district court[1] committed reversible error in admitting certain evidence and that the evidence was insufficient to support convictions on five of the counts. We affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

I.

Ali is a Somalian who first entered the United States in 1999 and began assisting in the preparation of tax returns in 2001 in Minnesota. In 2002, Ali moved his business, Cedar Tax Services, to Omaha, Nebraska. Cedar Tax Services first operated out of a grocery store near 25th and Leavenworth Streets and then relocated to an office building at 48th and Dodge Streets, near the South Sudan Community Association.

Ali had sole signature authority for Cedar Tax Services' bank account. Cedar Tax Services' unique electronic filing identification number (EFIN) was registered solely to Ali. Ali had the ability to provide refund checks to his clients, using refund anticipation loans and rapid anticipation checks through HSBC Taxpayer Financial Services (HSBC). Three employees worked for Ali at Cedar Tax Services.

The Internal Revenue Service (IRS) began investigating Cedar Tax Services in 2004 after receiving a report from its Fraud Detection Center (FDC). The report analyzed the 2003 returns filed under Ali's EFIN and revealed that 98.5% of those returns claimed refunds and 87% claimed the earned income tax credit.

IRS Special Agent Derick Tarr received the FDC's report and determined that many of the characteristics of returns could indicate fraud. At Tarr's request the FDC completed a similar analysis of the 2004 returns filed under Ali's EFIN. Tarr testified that on the 2004 returns 98% of the taxpayers claimed refunds and 75% claimed the earned income tax credit. Tarr also discovered that ten percent of the dependents claimed in 2003 were claimed by different taxpayers in 2004.

During Tarr's review of the FDC findings, Maye Maragan sought assistance from the IRS taxpayer services office in Omaha. Maragan explained to taxpayer services, and subsequently to a criminal investigator, that Ali had prepared her 2003

return, claiming a dependent whom she had never met. The criminal investigator showed Maragan a photograph of Ali, which Maragan identified as depicting the individual who prepared her 2003 return. Prior to seeking assistance with her 2004 return from the taxpayer services office, Maragan requested a copy of her 2003 return from Ali. Ali claimed to have misplaced her return and offered to prepare her 2004 return with the same dependent that he had used on the 2003 return, provided that the dependent was still "available." Maragan declined his offer.

Maragan agreed to cooperate with the IRS's investigation of Ali and to wear a wire to record a conversation with Ali in exchange for $1,000. On March 15, 2005, Maragan recorded a conversation with Ali regarding the preparation of her return and the availability of a dependent to increase her refund. When Maragan asked if Ali could find her another "kid," Ali responded "Now it's too late, but we can try. We will look for one." Ali later told Maragan:

> Yeah, I will see what I . . . if I get some for you. But now it's already too late, but we will see what we can do for you . . . no promises because it's too late. It's almost, in fact it's almost ending now, you know? . . . [B]ut we will find it. If there's something, we'll find it, and will let you know.

On April 11, 2005, Maragan placed a monitored telephone call to Ali to inquire about her 2004 return. Ali explained to her that she had turned down his offer to prepare the 2004 return with the same dependent as the 2003 return and that now the dependent was "already passed to someone else."

The IRS executed a search warrant at Cedar Tax Services on April 15, 2005. Agent Tarr testified that software used to prepare the returns he investigated prompted the filer to list the name of the dependent, the social security number of the dependent, the dependent's relationship to the taxpayer, and the number of months that the dependent lived with the taxpayer. Agents also seized Form 8453 documents, which

were signed by the taxpayer and the electronic return originator pursuant to an electronic filing. One document seized was a note to Ali regarding a client, stating that the return was put on hold because the taxpayer was "going to find a kid to file."

Ali was indicted on eleven counts of aiding and assisting the preparation of fraudulent tax returns, encompassing eleven returns of nine taxpayers during the 2003 and 2004 tax years. At trial, the government maintained that Ali solicited African immigrant clients and suggested that they could increase their tax refund by claiming dependents and credits to which they were not entitled and that he ultimately took a portion of the larger refund. Ali countered that his employees had prepared many of the fraudulent returns and that the taxpayers had provided false information for the returns.

Thirteen taxpayers testified about Ali's preparation of their tax returns. Many of these witnesses testified that Ali provided them with the names of foster children to claim as dependents in exchange for payment of a portion of the increased refund. Other witnesses who supplied their own alleged foster child kept substantially more of their refund. We summarize the witness testimony that is at issue in this appeal.

Rose Aganas (Count II) testified that she went to Ali for the preparation of her 2003 tax return. She told Ali that she was unmarried and had no children. She received a larger refund than she was expecting and Ali explained to her that he had added dependents to her file. Aganas did not know either of the foster children declared on her return. Aganas gave half of her refund to Ali, because Ali claimed it was to pay the family of the children listed on her return.

Aganas had also claimed foster children dependents on her 2002 return. The 2002 foster children she claimed had different names and social security numbers than the children listed on her 2003 return. Aganas could not recall who prepared her 2002 refund, only that it was prepared near 24th and Leavenworth Streets.

Butras Kuku (Count IV) testified that when Ali assisted him with his 2003 tax return, Ali told Kuku, "If you have a kid, you will get a lot of money." When Kuku stated that he did not have children, Ali replied "If . . . somebody you know can find a kid, then I can file it for you." Ali instructed Kuku to leave his documents at the office and to look for a dependent to claim. Ultimately, two dependents were listed as foster children on Kuku's 2003 return. Kuku provided the name and social security number of his nephew and Ali provided the name and social security number of a second child, whom Kuku had never met. Kuku's return also claimed a fuel tax credit, a credit typically utilized by individuals engaged in farming or commercial fishing. On cross-examination, Kuku testified that his nephew was claimed as a dependent on his 2002 return, which Ali prepared. When Kuku initially spoke to Agent Tarr, he told Tarr that the first time he met Ali was for the preparation of his 2003 return.

Simon Majok (Counts V and X) testified that he went to Ali for the preparation of his 2003 tax return. After Majok informed Ali that he was single, Ali advised Majok that "if you have something to claim, that's when you can get money. Otherwise they're going to claim—they're after your money because you're single." Ali found two children, whom Majok had never met, for him to claim as foster children on his 2003 return. When Majok returned to Ali's office to collect his refund, Ali advised Majok that Ali needed $2000 for the children. Majok and Ali argued about the money, but ultimately Majok paid Ali. Majok returned to Ali for the preparation of his 2004 return. For this return, Majok supplied the information for a neighbor's children. Ali did not inquire whether the children lived with Majok, were related to him, or were foster children, as Ali had listed them on the return. At trial, Majok was not able to identify Ali.

Joseph Malou (Count VII) testified that he went to Ali for the preparation of his 2002 return. When Malou informed Ali that he did not have a child, Ali encouraged him to find a child to claim as a dependent. Malou found a mother who allowed him to use one of her children as a dependent and returned to Ali with the child's name and

social security number. Ali listed the child as a foster child on the return without inquiring whether the child lived with Malou or if Malou supported the child. Ali prepared Malou's 2003 return and Malou received permission from the same woman to claim two of her children as dependents. Ali did not inquire whether Malou supported the children. Malou returned to Ali a third time for the preparation of his 2004 return and again claimed the same two dependents. Malou testified that he had told Agent Tarr during the investigation that Ali had provided the information for the fraudulently claimed dependents and that Malou had lied to Agent Tarr because he was scared.

Additionally, four taxpayers whose returns did not form the basis for indicted counts testified that Ali either supplied dependents for them to claim on their returns or encouraged them to seek out children to fraudulently claim as their dependents.

Taxpayers Aganas, Kuku, and Malou filed 2002 returns that falsely claimed dependents. No preparer was listed on those returns. In an attempt to link Ali to the returns, the government introduced exhibit 95, which included a letter from Gladys Hall, loss prevention manager at HSBC. Hall's letter stated:

> Per your request, this is a written statement to verify that [Aganas, Kuku, and Malou] filed 2002 income tax returns with Cedar Tax Services and applied for Refund Anticipation Checks. Upon receipt of funds from the Internal Revenue Service (IRS), authorizations were sent to the office of Cedar Tax Services to print the checks. The checks were printed at Cedar Tax Services, owned by Siyad Ali at 2555 Leavenworth Street, Omaha, NE 68105.

The exhibit also included the HSBC records for each taxpayer's 2002 refund anticipation check and copies of the cashier's checks issued to the taxpayers. The documents and letter were accompanied by a certification from Brian Wilson, custodian of records for HSBC, that they were made in the regular course of business.

Ali objected to exhibit 95 on the grounds of foundation and relevance. The government argued that the documents were admissible as business records under Federal Rule of Evidence 803(6) and were self-authenticating under Rule 902(11). The district court overruled Ali's objection and admitted the documents.

Ali raises several evidentiary issues and challenges the sufficiency of the evidence on the counts related to Aganas, Kuku, Malou, and Majok.

II.

A. Confrontation Clause

Ali argues that exhibit 95 was testimonial and that its admission violated his rights under the Confrontation Clause of the Sixth Amendment in light of Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009). Our review is limited to plain error because Ali failed to object to the exhibit on the basis of the Confrontation Clause. See Puckett v. United States, 129 S. Ct. 1423, 1428-29 (2009); see also Fed. R. Evid. 103; United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc) (explaining that an objection must be timely and clearly state grounds for objection to preserve error for appellate review); United States v. Thornberg, 844 F.2d 573, 575 (8th Cir. 1988) ("[P]reserving an issue is a matter of making a timely objection to the trial court and clearly stating the grounds for an objection, so that the trial court has an opportunity to prevent or correct the error in the first instance."). Plain error review requires Ali to show that (1) there was an error that was not affirmatively waived, (2) the error was "plain," meaning clear and obvious, (3) the error affects his substantial rights, and (4) the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Puckett, 129 S. Ct. at 1429 (citation and internal quotation marks omitted); see United States v. Marcus, 130 S. Ct. 2159, 2164 (2010).

In Melendez-Diaz, the Court held that admission of laboratory reports via a "certificate of analysis," rather than through the live testimony of the laboratory analyst violated the Confrontation Clause. 129 S. Ct. at 2542. The Court explained that the laboratory reports were testimonial because they were prepared for the purpose of providing evidence against the accused at trial. Id. at 2532. Melendez Diaz, however, does not apply to the HSBC business records that were kept in the ordinary course of business. These documents were nontestimonial and thus do not implicate the Confrontation Clause. See United States v. Mashek, 606 F.3d 922, 930 (8th Cir. 2010) (citing Crawford v. Washington, 541 U.S. 36, 56 (2004)). Accordingly, the district court did not err in admitting the bank records that had been certified by HSBC's custodian of records.

The letter from the HSBC loss prevention manager summarized HSBC's receipt and processing of the 2002 tax returns for Kuku, Malu, and Aganes. The letter was arguably equivalent to live, in-court testimony and thus not admissible as a business record. Ali did not object to the admission of the letter on Confrontation Clause grounds, however, and so even if we assume that the letter should not have been admitted, Ali cannot show that his substantial rights were affected. The letter addressed only three tax returns, none of which formed a basis for the indicted offenses. Ali's argument that the government could not prove that he had proposed adding false dependents without exhibit 95 is unpersuasive in light of the testimony by Kuku and Malou that Ali had prepared their 2002 returns and Aganas's testimony that her return was prepared near 24th and Leavenworth, a location at which Ali admitted he prepared tax returns. The properly admitted bank records showed that Kuku's, Malu's, and Aganas's 2002 returns were prepared with the same EFIN. Any error in admitting the letter thus did not affect Ali's substantial rights.

## B.  404(b) Evidence of Uncharged Misconduct

Ali argues that the district court abused its discretion when it admitted under Rule 404(b) the testimony of four taxpayers whose returns did not form the basis for any of the indicted counts.  Admission of Rule 404(b) evidence is normally reviewed for abuse of discretion, but when a litigant fails to object when the evidence was introduced, its admission is reviewed for plain error.  United States v. Koski, 424 F.3d 812, 817 (8th Cir. 2005).  Ali raised a relevance objection to three of the Rule 404(b) witnesses, while one Rule 404(b) witness testified without objection.  We need not resolve whether any Rule 404(b) error was preserved, because regardless of the standard of review Ali's claims fail.

Rule 404(b) prohibits the admission of prior bad act evidence when it is offered to prove the defendant's "conformity therewith."  Prior bad act evidence is admissible, however, when introduced for certain limited purposes and it (1) is relevant to a material issue, (2) is similar in kind and close in time to the crime charged, (3) is proven by a preponderance of the evidence, and (4) does not have a prejudicial effect that substantially outweighs the probative value.  United States v. Turner, 583 F.3d 1062, 1065-66 (8th Cir. 2009), cert. denied, 130 S. Ct. 1928 (2010).  Valid purposes for introduction include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or accident."  Fed. R. Evid. 404(b).  We will reverse "only when such evidence clearly ha[s] no bearing on the issues in the case and was introduced solely to prove the defendant's propensity to commit criminal acts."  United States v. Benitez, 531 F.3d 711, 716 (8th Cir. 2008).

For each count, Ali's defense was either that his employees were responsible for the information contained in the tax returns or that he was relying on the representations made to him by the taxpayers.  By claiming that he did not have knowledge that the representations were false, Ali put the willfulness of his conduct at issue, thus allowing the government to introduce evidence of his intent.  Even if Ali

did not actively dispute intent for each count, it was permissible for the government to present evidence of willfulness. See United States v. Walker, 428 F.3d 1165, 1170 (8th Cir. 2005) ("The mere fact that [the defendant] did not actively dispute motive or intent did not preclude the government from offering otherwise admissible evidence as to these factors."). Thus, the prior acts evidence was relevant on the issue of whether Ali willfully committed tax fraud.

All of the prior acts evidence is sufficiently contemporaneous and similar in kind to the crimes charged to satisfy Rule 404(b). See United States v. Shoffner, 71 F.3d 1429, 1432 (8th Cir. 1995) ("When admitted for the purpose of showing intent, the prior acts need not be duplicates, but must be sufficiently similar to support an inference of criminal intent."). All four 404(b) witnesses testified that Ali either provided a dependent for them or suggested that they find a dependent to claim. The witness testimony and their tax returns established Ali's prior conduct by a preponderance of the evidence. Finally, the prior acts evidence was highly probative given the similarity between the prior acts and indicted counts, and Ali has failed to demonstrate a risk of unfair prejudice. See United States v. Gipson, 446 F.3d 828, 831 (8th Cir. 2006).

For all of these reasons, we conclude that the district court did not abuse its discretion in admitting the Rule 404(b) evidence. Moreover, because of the strength of the government's other evidence, any error in admission of the evidence was both harmless and did not affect Ali's substantial rights.

### C. Signature Testimony

Ali argues that the district court erred by allowing Agent Tarr to testify that the signatures on the Form 8453 documents, exhibits 37 through 44, appeared similar to the signatures on Ali's bank and fingerprint cards. Ali did not object to the testimony, and so again we review for plain error. Puckett, 129 S. Ct. at 1428-29.

Exhibits 37 through 44 were admitted into evidence after Agent Tarr testified that they were the forms that were seized from Cedar Tax Services during the execution of the search warrant. Tarr testified that they appeared to be signed by the taxpayers and the return preparer and that the names of the taxpayers corresponded with the taxpayers named in the indictment. Tarr testified that during the investigation he obtained Ali's bank signature card and signed fingerprint card. Tarr answered affirmatively the question of whether the signatures on those forms "appear to be similar to the signatures contained on exhibits 37 through 44."

For the exhibits to be offered as proof that the signature was Ali's, the evidence had to comply with both Federal Rules of Evidence 901 and 701. See United States v. Scott, 270 F.3d 30, 49 (1st Cir. 2001) (requiring satisfaction of both rules to authenticate a document as evidence that tended to prove that the handwriting belonged to the defendant). Rule 901(b)(2) provides that one way to authenticate a document, a condition precedent to admissibility, is to provide a nonexpert opinion on the genuineness of the handwriting, based upon familiarity not acquired for purposes of the litigation. Rule 701 permits a lay witness to provide "opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

We have held that an officer's single exposure to an uncontested signature and a single exposure to a contested one constituted adequate familiarity under Rule 901(b)(2) to permit authentication testimony. United States v. Standing Soldier, 538 F.2d 196, 202 (8th Cir. 1976). In Standing Soldier, the officer was permitted to testify that he had compared the signature on the document in question with that of the appellant on the signed statement and found them to be the same. Id. Contrary to Ali's contention, observing Ali producing his signature is not the only way that Tarr could obtain the familiarity necessary to authenticate the signature. "Other categories

of experience can . . . demonstrate familiarity, such as seeing signatures on writings purporting to be those of the alleged author when the circumstances would indicate that they were genuine." Scott, 270 F.3d at 50; see Standing Soldier, 538 F.2d at 202 ("Because the signature on the prior signed statement was clearly made in circumstances indicating its genuineness, Captain Hill possessed an adequate familiarity with the appellant's signature to authenticate the note."). During the investigation Agent Tarr gained familiarity with Ali's bank signature card and fingerprint card, which have indicia of reliability. Agent Tarr's familiarity with Ali's signature was sufficient to authenticate the exhibits.

Turning to Rule 701, in United States v. Garth, we upheld the district court's admission of an IRS investigating agent's testimony that all the preparer signatures on fraudulent returns appeared to be in similar handwriting, concluding that the testimony was "rational, helpful, and not based on expert knowledge." 540 F.3d 766, 778-79 (8th Cir. 2008), abrogated on other grounds by United States v. Villareal-Amarillas, 562 F.3d 892 (8th Cir. 2009). Agent Tarr was not making a scientific, technical or specialized handwriting analysis. Rather, he simply testified that the signatures on Ali's bank and fingerprint cards appeared to be similar to the signatures on the Form 8453 documents. Tarr's testimony was rational, helpful, and not based on expert knowledge. See id. at 779. Although we noted in Garth that all the documents were admitted into evidence for the jury to consider, whereas in this case the bank signature card and fingerprint card were not entered into evidence, our holding was not predicated on that circumstance.

Ali has failed to demonstrate prejudice such that the admission Tarr's testimony about his signature affected his substantial rights. See Marcus, 130 S. Ct. at 2164. Each of the taxpayers whose Form 8453 documents were presented testified that Ali had prepared their returns, and Agent Tarr stated his opinion only once. Thus, there was substantial other testimony that Ali prepared the returns. Moreover, Ali could have cross-examined Tarr on his limited familiarity with Ali's signature.

-12-

D.  Sufficiency of the Evidence

Pointing to discrepancies and inconsistencies in the testimony, Ali argues that the evidence presented at trial was insufficient to support his conviction on Counts II, IV, V, VII, and X.  We review the sufficiency of the evidence *de novo*, viewing the record in the light most favorable to the verdict and accepting all reasonable inferences that support the verdict.  United States v. Hamilton, 332 F.3d 1144, 1148 (8th Cir. 2003).  "We reverse only if no reasonable jury could find the defendant guilty beyond a reasonable doubt."  United States v. Spears, 454 F.3d 830, 832 (8th Cir. 2006).  We do not weigh the evidence or assess the credibility of the witnesses.  Id.  The jury has the responsibility of resolving conflicts or contradictions in testimony, and we resolve any credibility issues in favor of the verdict.  Id.

An offense under 26 U.S.C. § 7206(2) has three essential elements:  (1) the defendant aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return; (2) the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful.  See United States v. Sassak, 881 F.2d 276, 278 (6th Cir. 1989).

1.  Counts II, IV and VII

Ali argues that sufficient evidence was not presented to establish that Ali knew that the dependents were fraudulently claimed for Counts II (Rose Aganas), IV (Butras Kuku), and VII (Joseph Malou).  Ali highlights discrepancies in the evidence and points to evidence suggesting that he may not have proposed the fraudulent deductions.  Each taxpayer testified that Ali proposed the addition of dependents on his or her return.  We decline to resolve any contradictions in the testimony, as that is the jury's task.  For each count there was sufficient evidence admitted from which a reasonable jury could conclude beyond a reasonable doubt that Ali committed the offenses.

-13-

## 2. Counts V and X

Ali argues that because Simon Majok was unable to make a courtroom identification of Ali, the government failed to offer sufficient evidence that Ali prepared the returns involved in counts V and X. Majok testified that he went to Ali's Dodge Street office and met with a man who said that his name was Siyad Ali. Majok described an interaction similar to many other taxpayers, in which Ali provided him with a dependent to claim and then demanded payment from the increased refund. Majok's 2003 and 2004 returns list Ali as the paid preparer. Ali argues that he had several assistants who had full access to the return preparation software and that other taxpayers reported that their returns were prepared by Ali's assistants. Accepting as we must all reasonable inferences that support the verdict, we conclude that Ali has failed to establish that no reasonable jury could find him guilty beyond a reasonable doubt.

## III.

The judgment is affirmed.

_____